# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JUDY ALIFERIS and BRIAN GAUGHAN, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> GENERATIONS HEALTH CARE ) <br> NETWORK AT OAKTON PAVILLION, LLC,) <br> and GENERATIONS HEALTH CARE ) <br> NETWORK AT OAKTON ARMS, LLC, ) <br> ) <br> Defendants. ) | No. 15 C 3489 <br><br> Judge Edmond E. Chang |

## MEMORANDUM OPINION AND ORDER

Judy Aliferis and Brian Gaughan filed this lawsuit against their former employers, Generations Health Care Network at Oakton Pavillion, LLC, and Generations Health Care Network at Oakton Arms, LLC, alleging discrimination on the basis of disability in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Illinois Human Rights Act (IHRA), 775 ILCS 5/1-101 *et seq.*[1] R. 39, Second Am. Compl.[2] Aliferis alleges that the Defendants fired her because she had cancer, *id.* ¶¶ 20-25, and Gaughan alleges that he was fired because of his association with Aliferis, *id.* ¶¶ 26-31. The Defendants now move for

---

[1]This Court has subject matter jurisdiction over the ADA claims under 28 U.S.C. § 1331 and the IHRA claim under 28 U.S.C. § 1367.

[2]Citations to the docket are indicated by "R." followed by the docket entry and, when necessary, a page or paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for the Defendants' Statement of Facts) [R. 50]; "PSOF" (for Gaughan's Statement of Additional Facts) [R. 56]; "Pl.'s Resp. DSOF" (for Gaughan's Response to the Defendants' Statement of Facts) [R. 55]; and "Defs.' Resp. PSOF" (for the Defendants' Response to Gaughan's Statement of Additional Facts) [R. 62]. Where a fact is undisputed, only the asserting party's statement of facts is cited; where an assertion is made by one party and is otherwise challenged, it is so noted.

summary judgment on Gaughan's claims of association discrimination. R. 46, Mot. Summ. J.; R. 47, Defs.' Summ. J. Br. For the reasons discussed below, the motion is in large part denied.[3]

**I. Background**

For purposes of this motion, the following facts are viewed in the light most favorable to Gaughan (because he is the non-movant), and all reasonable inferences are drawn in his favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In July 2012, Gaughan began working as a receptionist for Oakton Pavillion, Inc.'s senior living facility in Des Plaines, Illinois. R. 50, DSOF ¶¶ 4, 5, 7. His partner, Judy Aliferis,[4] had worked for Oakton Pavillion's skilled nursing facility since at least January 2010. *Id.* ¶ 4; R. 56, PSOF ¶ 1. The two facilities are located in nearby buildings. DSOF ¶ 4.

On his first day of work at Oakton Pavillion, Gaughan received an Employee Handbook detailing his employer's discipline and attendance policies. DSOF ¶¶ 9-10; R. 50-5, Defs.' Exh. 5, Acknowledgment of Receipt of Employee Handbook; R. 50-6, Defs.' Exh. 6, Oakton Place Employee Handbook. The Handbook stated that employees who "[l]e[ft] the premises without authorization during working hours" would be immediately fired. Defs.' Exh. 6 at DEF000044-45, Oakton Place Employee Handbook at 21-22.

---

[3]Gaughan concedes in his response brief that the IHRA claim should be dismissed, *see* R. 54, Pl.'s Resp. Br. at 2 n.1, so the Defendants' motion is granted as to that claim. Given how deep into the case the dismissal comes, the dismissal is with prejudice.

[4]Gaughan owns a home with Aliferis and the two have lived together since at least 2008. PSOF ¶ 1. Although both are legally married to other individuals, Gaughan and Aliferis believe they have a common law marriage. DSOF ¶ 19. Aliferis also listed Gaughan as her life insurance beneficiary beginning in January 2010. PSOF ¶ 1.

In March 2014, Aliferis was diagnosed with breast cancer. DSOF ¶ 20. In light of this, Aliferis often had doctor's appointments during the week, and Gaughan routinely drove her to them. *Id.* ¶¶ 21-22. Oakton Pavillion gave Aliferis complete flexibility with her schedule so that she could make her doctor's appointments. PSOF ¶ 6. Even with this flexibility, however, Aliferis submitted a Request for Family Medical Leave on August 18, 2014 due to her diagnosis. *Id.*

To take time off for Aliferis's appointments, Gaughan would fill out a "Requesting a Change in Schedule" form and place the form in the internal mail delivery system. DSOF ¶¶ 16-17; PSOF ¶ 8. After the form was filled out and internally mailed, either Maureen Krahl, Gaughan's supervisor, DSOF ¶ 13, or Jay Lewkowitz, the administrator at Oakton Pavillion, *id.* ¶ 5, would approve the request, sign the form, and return a copy to Gaughan, *id.* ¶ 17; PSOF ¶ 11. The Defendants acknowledge that it was appropriate for Gaughan to submit his requests for time off to Krahl. *See* R. 62, Defs.' Resp. PSOF ¶ 12. Gaughan would keep the returned forms in his bag in case any payroll issues came up. PSOF ¶ 14. According to Gaughan, he always followed this procedure when requesting time off. DSOF ¶ 18. It is unclear whether Oakton Pavillion required supervisors to maintain copies of approved "Requesting a Change in Schedule" forms in employees' personnel files. According to Krahl, there was no such requirement. R. 56-4, Pl.'s Exh. 4, Krahl Dep. 59:6-60:5; *see also* PSOF ¶ 13. But Ron Tan, Oakton Pavillion's payroll manager, had allegedly told the facilities administrator (Bart Barrish) that

3

a copy was supposed to go into the employee's personnel file. R. 50-3, Defs.' Exh. 3, Barrish Dep. 165:17-168:8; Defs.' Resp. PSOF ¶ 13.

On September 1, 2014, the Defendants bought Oakton Pavillion's two facilities. DSOF ¶ 6. At that time, Bart Barrish took over as the facilities' administrator. PSOF ¶ 5. Barrish knew that Aliferis had cancer before he took over and had even decided to fire Aliferis as early as July 2014. *Id.* ¶¶ 2, 5. (Aliferis was not actually fired until September 11, 2014. DSOF ¶ 29.) He also discovered during this time that Aliferis and Gaughan were in a relationship. PSOF ¶ 17; Defs.' Resp. PSOF ¶ 18; Barrish Dep. 157:2-8.

Barrish also decided to fire Krahl when the Defendants acquired Oakton Pavillion. DSOF ¶ 14. Her last day was September 9. *Id.* Although both sides admit that Barrish became Gaughan's supervisor as of September 1, Gaughan maintains that Krahl was *also* his supervisor up until her last day of work. *Compare* DSOF ¶ 15, *with* Pl.'s Resp. DSOF ¶ 15.

Aliferis had a doctor's appointment scheduled for September 11, 2014. DSOF ¶ 23. Gaughan had planned to take Aliferis to this appointment and accordingly submitted a "Requesting a Change in Schedule" form. *Id.* ¶ 24. Neither he nor Krahl remember exactly when Gaughan submitted the form, but both sides agree that he did so before September 11. *Id.* ¶¶ 24, 25; PSOF ¶ 9. Krahl thereafter returned a signed copy of the form to Gaughan. PSOF ¶¶ 9-10; R. 50-9, Defs.' Exh. 9, September 11, 2014 Requesting a Change in Schedule Form. The form never ended up in Gaughan's personnel file. DSOF ¶ 26.

4

Before Aliferis and Gaughan left for the doctor's on September 11, Barrish fired Aliferis. DSOF ¶ 29. (Shortly thereafter, Barrish allegedly admitted at a staff meeting that Aliferis was fired because of her health. PSOF ¶ 27; *see also* Krahl Dep. 192:5-193:7; R. 56-14, Pl.'s Exh. 14, Chapman Aff. ¶¶ 6-7; R. 56-15, Pl.'s Exh. 15, Smith Dep. 47:15-22, 48:5-23.) The parties dispute whether Barrish was aware that Aliferis had a doctor's appointment that day. *Compare* DSOF ¶ 29; Defs.' Resp. PSOF ¶ 18, *with* Pl.'s Resp. DSOF ¶ 29. It is undisputed, however, that Barrish saw Aliferis and Gaughan leave together. PSOF ¶ 18; Barrish Dep. 157:2-8 ("Q: How did you become aware [that Gaughan was Aliferis's boyfriend] on September 11th? / A: When he left with her, someone told me that they were together."). Aside from submitting the "Requesting a Change in Schedule" form and receiving Krahl's permission to leave, Gaughan did not tell anyone that he was taking Aliferis to the doctor. DSOF ¶ 31; Pl.'s Resp. DSOF ¶ 31.

Later that day, Barrish discovered that there was no one manning Gaughan's post at the senior living facility's reception desk. DSOF ¶ 32. Barrish did not ask anyone where Gaughan was or try to contact Gaughan for an explanation as to why he was not at work. PSOF ¶ 19. He did, however, review Gaughan's personnel file to see if there was a "Requesting a Change in Schedule" form accounting for his absence that day. DSOF ¶ 33. After finding no copy of the form in Gaughan's file, Barrish decided to fire Gaughan. *Id.* ¶¶ 33-34.

Gaughan worked his entire shift at the reception desk the next day before Barrish called him in for a meeting. DSOF ¶¶ 35-36. At the meeting, Barrish told

Gaughan that leaving his post at the reception desk violated the Employee Handbook. *Id.* ¶ 37. Gaughan explained that he had left work early the day before in order to take Aliferis to her doctor's appointment. PSOF ¶ 21.[5] He also told Barrish that Krahl had pre-approved his absence; that is, she had signed off on the request for time off form that he had previously submitted to her. *Id.* ¶ 22.

The parties dispute what happened next. Gaughan claims that he told Barrish that the form was in his bag just next door at the senior living facility, but Barrish refused to let him go get the form. PSOF ¶¶ 23-24; Pl.'s Resp. DSOF ¶ 40; R. 50-2, Defs.' Exh. 2, Gaughan Dep. 54:3-14, 66:2-67:9. The Defendants, by contrast, maintain that Barrish refused to let Gaughan produce the form only after Gaughan told him that the form was at home, not next door. DSOF ¶ 40; Defs.' Resp. DSOF ¶¶ 23-24; Barrish Dep. 177:6-180:20. Barrish then fired Gaughan. DSOF ¶ 39. Before this incident, Gaughan never had any disciplinary or attendance issues. *Id.* ¶ 12. Later that week, on September 14, Krahl sent an email to Tan confirming that Gaughan had permission to take September 11 off. PSOF ¶ 26.

---

[5]The Defendants maintain that "Gaughan told Barrish he [took] Aliferis to a doctor's appointment <u>after</u> Barrish told Gaughan that leaving his post and [the] facility without permission[] was unacceptable and considered job abandonment." Defs.' Resp. PSOF ¶ 21 (underline in original); *see also* R. 50-11, Defs.' Exh. 11, Gaughan Termination Record ("On 9/12/14 B. Gaughan came back to work and I [Barrish] called him to my office to discuss prior days['] events. I informed B. Gaughan that leaving his post & facility without permission was unacceptable and is considered job abandonment. B. Gaughan responded that yesterday (9/11/14) was an approved day off to transport Judy Aliferis to a doctor's [appointment] and stated he had approval from former administrator, Maureen Krahl."). For purposes of deciding this motion, it makes no difference whether Gaughan explained away his absence *before* or *after* Barrish stated that leaving the reception desk unattended was unacceptable.

6

Before Krahl was fired, she would routinely communicate with payroll about employees' absences. *Id.*

Aliferis and Gaughan brought this lawsuit in April 2015, alleging that the Defendants discriminated against them based on Aliferis's disability in violation of the ADA, 42 U.S.C. § 12101 *et seq.*, and the IHRA, 775 ILCS 5/1-101 *et seq. See* R. 4, Compl.; Second Am. Compl. ¶¶ 20-31. The Defendants now move for summary judgment on all of Gaughan's claims. Mot. Summ. J.; Defs.' Summ. J. Br. Gaughan has since conceded dismissal of his IHRA claim, *see* R. 54, Pl.'s Resp. Br. at 2 n.1, so the remaining dispute is Gaughan's ADA claim based on association discrimination.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no

genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

Gaughan brings an association discrimination claim under the ADA, 42 U.S.C. § 12112(b)(4), asserting that Barrish fired him due to his relationship with Aliferis. Second Am. Compl. ¶¶ 26-28. Given that he followed company policy when requesting time off on September 11, 2014, Gaughan argues that Barrish's reason for firing him—leaving work without permission—is merely a front for the Defendants' discrimination. Pl.'s Resp. Br. at 4-10.

The ADA prohibits employers from discriminating against an employee "because of the known disability of an individual with whom [the employee] is known to have a relationship or association." 42 U.S.C. § 12112(b)(4); *see also* 29 C.F.R. § 1630.8 ("It is unlawful for a covered entity to exclude or deny equal jobs or benefits to, or otherwise discriminate against, a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a family, business, social or other relationship or association."). Although employers may not engage in association discrimination, "[they] are not required to provide reasonable accommodations to non-disabled workers." *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 336 (7th Cir. 2012); *see also* 29 C.F.R. Pt.

8

1630, App. § 1630.8 ("[A]n employer need not provide … [an] employee without a disability with a reasonable accommodation because that duty only applies to qualified … employees with disabilities.").

The only issue before the Court is whether a reasonable juror could conclude that Aliferis's disability was a "determining factor" in Barrish's decision to fire Gaughan. *Magnus*, 688 F.3d at 337 ("Magnus's claim on appeal is association discrimination under the ADA and therefore, to succeed, she must present evidence that her daughter's disability was a determining factor in the church's termination decision."). In other words, to survive summary judgment, Gaughan must show that there is a factual dispute over whether Barrish had a "discriminatory intent" based on Aliferis's disability. *Id.* at 338. The parties focus much of their briefing on whether and how to apply the (now-defunct) "direct method" or the modified *McDonnell Douglas* test,[6] sometimes confusingly referred to as the "indirect method." But the Seventh Circuit recently rejected, hopefully once-and-for-all, this direct-versus-indirect dichotomy. *See Ortiz v. Werner Enters., Inc.*, — F.3d —, 2016 WL 4411434 (7th Cir. 2016).[7] Instead of "separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards," *Ortiz* reasoned that "all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at *5. Applying that reasoning here means that summary judgment for the Defendants is only appropriate if a reasonable juror could not conclude based on *all* of the

---

[6]In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), the Supreme Court devised a burden-shifting framework for scrutinizing employment discrimination cases.

[7]Although *Ortiz* dealt with a Title VII employment discrimination claim, there is no reason to think that the Seventh Circuit's analysis does not apply to employment discrimination claims brought under the ADA.

9

evidence that Aliferis's disability was a determining factor in Gaughan's termination. *Id.*; *see also Magnus*, 688 F.3d at 337-38.

To be sure, Gaughan could have invoked the *McDonnell Douglas* framework to establish a prima facie case of association discrimination under the ADA.[8] *See Ortiz*,

---

[8]In *Larimer v. International Business Machines Corp.*, the Seventh Circuit adopted a modified *McDonnell Douglas* framework for association discrimination claims under the ADA. 370 F.3d 698, 701-02 (7th Cir. 2004). To establish a prima facie case of association discrimination, a plaintiff must show that: "(1) she was qualified for the job at the time of the adverse employment action; (2) she was subjected to an adverse employment action; (3) she was known by her employer at the time to have a relative or associate with a disability; and (4) her case falls into one of the three relevant categories of expense, distraction, or [disability by] association." *Dewitt v. Proctor Hosp.*, 517 F.3d 944, 948 (7th Cir. 2008) (citing *Larimer*, 370 F.3d at 701-02).

Even though Gaughan does not need to invoke the modified framework in order to survive summary judgment, it is worth discussing the fourth element of the prima facie case, if only to show how the straight-jacket of the framework cannot displace the totality-of-the-evidence analysis. In *Larimer*, the Seventh Circuit identified expense, distraction, and disability by association as "[t]hree types of situations [that] are … within the intended scope of the rarely litigated … association section." 370 F.3d at 700. *Larimer* reasoned that these three situations evidenced "an employer['s] … motive to discriminate against a nondisabled employee who is merely associated with a disabled person." *Id.* at 702. In the "expense" situation, "an employee['s] … spouse [for example] has a disability that is costly to the employer (i.e., he is covered by the company's health plan) … ." *Dewitt*, 517 F.3d at 947-48. The "distraction" category captures situations where "the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation … ." *Larimer*, 370 F.3d at 700. And finally, "disability by association" refers to situations where an employer fears that an employee will contract a disease or develop a disability based on his relationship to someone with that disease or disability. *Id.* If the plaintiff presents sufficient evidence establishing that his case falls within any of these three categories (in addition to establishing the first three elements of the modified *McDonnell Douglas* test), then she has a prima facie case of employment discrimination. *Id.* at 701-02. But *Larimer* did not purport to identify the *sole* grounds for advancing an association discrimination claim, and the *McDonnell Douglas* test is just one way in which a plaintiff can survive summary judgment, *see Dewitt*, 517 F.3d at 948 ("While all this may be well and good, we think Dewitt's case, in the final analysis, does not have to be considered in light of the tweaked *McDonnell Douglas* test because she has fairly persuasive circumstantial evidence [of discrimination]."); *Larimer*, 370 F.3d at 701 ("*Having no evidence*, Larimer falls back on the ubiquitous *McDonnell Douglas* test for a prima facie case of employment discrimination." (emphasis added)); *id.* ("A plaintiff who can produce evidence of actual discrimination on the basis of disability has made out a prima facie case without regard to *McDonnell Douglas*."). As discussed later, *see infra* Section III. at 11-17, the Court need not scrutinize Gaughan's claim under that the *McDonnell Douglas* test

2016 WL 4411434, at *5; *see also Larimer v. Int'l Bus. Machines Corp.*, 370 F.3d 698, 701-02 (7th Cir. 2004) (articulating a modified *McDonnell Douglas* test for analyzing association discrimination claims under the ADA). *Ortiz* in no way questioned the *McDonnell Douglas* test as a means for establishing a prima facie case of employment discrimination. 2016 WL 4411434, at *5 ("Today's decision does not concern *McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand."). But Gaughan did not choose to go the *McDonnell Douglas* route. Instead, Gaughan asserts that a reasonable factfinder could conclude based on the totality of the evidence[9] that the Defendants discriminated against him based on his relationship with Aliferis. *See* Pl.'s Resp. Br. at 8-9 ("Gaughan has established sufficient evidence to let a jury decide whether his association with Aliferis was a determining factor in Defendant[s'] decision to terminate [him].").

The Court agrees. To start, the circumstances under which Gaughan was fired support a conclusion that discriminatory intent fueled his firing. Courts may infer a causal link between a plaintiff's firing and discriminatory intent based on the context in which the firing occurs. *See Magnus*, 688 F.3d at 338 ("We have 'underscored the importance of context in assessing whether an inference of

---

because he has established that a reasonable factfinder could conclude based on the totality of the evidence that the Defendants discriminated against him in violation of the ADA.

[9]Though Gaughan primarily frames his argument using the (now-defunct) "direct method"—that is, proving his ADA claim with "direct" evidence of discrimination—*see* Pl.'s Resp. Br. at 4-8, what he really is arguing is that in light of all of the evidence, a reasonable juror could conclude that Aliferis's disability was a "determining factor" in the Defendants' decision to fire him, *see id.* at 8-9.

11

causality [in an employment discrimination case] is warranted.'" (quoting *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011))); *see also, e.g., Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1021 (8th Cir. 2005) (reversing summary judgment for the defendant based on the context in which the plaintiff's termination occurred: "[the plaintiff] maintained a stellar employment record at the Bank over an eleven-year period leading up to the child's birth and was objectively qualified for the new [] VP of Customer Support position but was dismissed from the start as a non-viable candidate … ."). In this case, it is crucial that the context includes Barrish's alleged disability discrimination against Gaughan's partner, Aliferis. Remember that Barrish allegedly admitted at a staff meeting that Aliferis was fired because her health was supposedly too poor to lead the nursing department. PSOF ¶ 27; *see also* Krahl Dep. 192:5-193:7; Chapman Aff. ¶¶ 6-7; Smith Dep. 47:15-22, 48:5-23. Indeed, Barrish had decided to fire Aliferis, knowing that she had cancer, even before the Defendants took over the facilities and before he became the administrator. PSOF ¶¶ 2, 5. And Barrish knew that Aliferis and Gaughan were in a relationship. PSOF ¶ 17; Defs.' Resp. PSOF ¶ 18; Barrish Dep. 157:2-8.

So that was the context on September 11, when Barris fired Aliferis and made the decision to fire Gaughan. The only reason the Defendants give for firing Gaughan was his absence from work on September 11, 2014.[10] Barrish supposedly decided to fire Gaughan that day "upon learning that [he] was not at his post and

---

[10]Gaughan did not have a history of unauthorized absences, or a disciplinary record whatsoever for that matter, *see* DSOF ¶ 12, so the Defendants cannot even point to a string of unauthorized absences to support their position.

12

[that] there was no 'Requesting a Change in Schedule Form' to be found." DSOF ¶ 34; Barrish Dep. 170:7-12 ("Q: And then what did you – what else did you do with respect to [Gaughan]? / A: I started to write my termination memo for him. / Q: That was on the 11th? / A: Yes."). That was the extent of Barrish's investigation—confirming that Gaughan was not at his desk and reviewing Gaughan's personnel file to see whether it contained a request for time off form. DSOF ¶ 34; Barrish Dep. 169:7-170:12. Without knowing who was responsible for maintaining employees' personnel files and the forms in them, Barrish still arrived at the conclusion that Gaughan's absence was unauthorized and warranted his firing. Barrish did not even try to contact Gaughan for an explanation as to why he had left. PSOF ¶ 19; Barrish Dep. 170:7-21. And despite having a lead as to Gaughan's whereabouts—Barrish saw Gaughan leave that morning with Aliferis, *see* PSOF ¶ 18; Defs.' Resp. PSOF ¶ 18; Barrish Dep. 157:2-8 ("Q: How did you become aware [that Gaughan was Aliferis's boyfriend] on September 11th? / A: When he left with her, someone told me that they were together.")—Barrish failed to ask Aliferis's former co-workers or anyone else where Gaughan might have gone, *see* PSOF ¶ 19; Barrish Dep. 170:7-21. Even the Defendants admit that there "was not a clear chain of command" once they took over in early September 2014. DSOF ¶ 15.[11] A jury could readily conclude that the sheer unreasonableness of the firing decision, and the thought process leading to that decision, means that in reality Barrish was looking

---

[11]For his part, Gaughan maintains that there was a clear chain of command and that Krahl remained his supervisor until she was fired on September 9, 2014. Pl.'s Resp. DSOF ¶ 15.

13

for an excuse to fire Gaughan because he had a relationship with Aliferis, who in turn Barrish was firing due to her disability.

That Barrish's decision to fire Gaughan largely hinged on the absence of a "Requesting a Change in Schedule" form in Gaughan's personnel file is also a suspicious explanation that a jury could rely on in finding association discrimination. Barrish does identify one Oakton Pavillion employee—Ron Tan, the payroll manager—who he claims said that requests for time off were kept in employees' personnel files. *See* Barrish Dep. 167:20-168:4 ("Q: What's the basis for … your testimony, that the form would have gone into the personnel file? / A: That's what I was told was the proper procedure. / Q: Who told you that? / A: The person who does payroll. Ron Tan."). But other evidence, such as Krahl's deposition testimony, *see* Krahl Dep. 59:6-24, and the Oakton Pavillion Employee Handbook, *see* Defs.' Exh. 6, shows (when the evidence is viewed in Gaughan's favor) that Oakton Pavillion did not require anyone to maintain "Requesting a Change in Schedule" forms in employees' personnel files. What's more, there is no evidence that Barrish asked anyone but Tan about the protocol for approving employee absences, nor did Barrish try to get Gaughan's explanation for why the form was not in his personnel file. In short, Barrish's refusal to meaningfully investigate Gaughan's absence undermines the contention that Barrish truly was firing Gaughan for leaving work early. It also suggests—or at least a reasonable factfinder could conclude—that Barrish actively avoided finding out whether Gaughan received permission to leave just to have some pretext to fire him. *Cf. Strate*, 398

F.3d at 1020-21 (rejecting the defendant's articulated business reason for terminating the plaintiff based on "evidence showing that [the plaintiff] was objectively qualified for the new VP of Customer Support position, but was written off from the start as a non-viable candidate for the job").

Indeed, Barrish's effort to actively avoid the truth spilled over to the next day when he called Gaughan in for a meeting and fired him. The parties dispute whether Gaughan said his signed request for time off was at home or at work. *Compare* PSOF ¶ 23, *with* Defs.' Resp. PSOF ¶ 23. Nevertheless, at this stage the Court must credit Gaughan's version of the facts: that is, Gaughan told Barrish the form was in his bag at the senior living facility and that Barrish refused to let him go get it. *See* PSOF ¶¶ 23-24; Pl.'s Resp. DSOF ¶ 40; Gaughan Dep. 54:3-14, 66:2-67:9. Even if Gaughan told Barrish that the form was at home, as Barrish contends, the Defendants have not offered any explanation (for example, the company's attendance policy) justifying Barrish's refusal to let Gaughan go home and return with the form.

The Defendants try to recast Barrish's decision to fire Gaughan as, at worst, a mere mistake, and not discrimination. R. 63, Defs.' Reply Br. at 5 ("What this undisputed evidence amounts to is a claim that Barrish made the wrong decision. But being wrong is an employer's right."). (Understandably, the Defendants really had no choice but to argue that Barrish made a mistake given that Gaughan has produced the relevant form accounting for his absence on September 11, DSOF ¶ 26; Defs.' Exh. 9, September 11, 2014 Requesting a Change in Schedule Form, and that

Krahl has repeatedly confirmed that she pre-approved Gaughan's absence, Krahl Dep. 179:17-21; PSOF ¶ 26.) To be sure, employers are only on the hook for discriminatory practices, not mere mistakes. *See Magnus*, 688 F.3d at 338 ("Further, it matters not that McCoy's evaluation may have been wrong, what matters is whether he honestly believed that Magnus's performance was deficient."); *cf. O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) ("[W]e do not sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by [companies] charged with employment discrimination." (quotations omitted)). And sure, a reasonable fact finder could conclude that Barrish's decision to fire Gaughan was not discriminatory, but rather just a product of Barrish's incompetence or poor judgment. But a reasonable fact finder could also conclude that there was no mistake here. The September 12 meeting where Barrish fired Gaughan supports the latter conclusion. At the meeting, Gaughan explained that Krahl had pre-approved his absence and told Barrish that he had the form to prove it. PSOF ¶¶ 22-23; Defs.' Resp. PSOF ¶ 23. But Barrish refused to let him go get it, PSOF ¶ 24; Defs.' Resp. PSOF ¶ 24, which suggests that Barrish did not really care about the absence. In sum, the manifold shortcomings in Barrish's investigation and decision-making process both cast doubt on whether he truly decided to fire Gaughan on the basis of the absence and suggest that association discrimination is really what drove the termination.

Not only do the circumstances underlying Barrish's decision to fire Gaughan support a claim for association discrimination, but the timing of Gaughan's

16

termination does too. The timing of an employee's termination can help establish discriminatory intent. *Magnus*, 688 F.3d at 338 (observing that "temporal proximity can serve as an important evidentiary ally of the plaintiff"); *Dewitt*, 517 F.3d at 948 (concluding that "the timing of Dewitt's termination suggests that the financial albatross of [the plaintiff's husband's] continued cancer treatment was an important factor in Proctor's decision [to fire the plaintiff]."). Here, the evidence establishes a close temporal proximity between the time that Barrish fired Aliferis and fired Gaughan: both events occurred on the same day. Because a reasonable fact finder could conclude that the Defendants engaged in association discrimination based on both the timing of and the circumstances underlying Gaughan's termination, the Defendants' motion for summary judgment must be denied.[12]

---

[12]Despite the Defendants' claim to the contrary, *see* Defs.' Reply Br. at 3 ("The omission of the *McDonnell-Douglas* test does not excuse [Gaughan] from placing his claim within one of the three categories of associational disability." (case not italicized in original)), Gaughan does not have to pigeonhole his claim into one of the three categories *Larimer* identified as "within the intended scope of the … association section." 370 F.3d at 700; *see also Magnus*, 688 F.3d at 336 ("In [*Larimer*], we outlined three categories into which 'association discrimination' plaintiffs *generally fall* … ." (emphasis added)); *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011) (observing that "the three theories articulated in *Larimer* are not necessarily an exhaustive list … ."); *Dewitt*, 517 F.3d at 947 ("In [*Larimer*], we outlined three categories into which 'association discrimination' plaintiffs *generally* fall." (emphasis added)); *id.* at 948-49 (analyzing the plaintiff's claim under a totality of evidence approach without specifically categorizing it as an expense, distraction, or disability by association situation). These three categories—expense, distraction, and disability by association—are examples of the type of evidence of "an employer['s] … motive to discriminate against a nondisabled employee who is merely associated with a disabled person." *Larimer*, 370 F.3d at 702. Remember, what really matters in a *disability* discrimination case is whether there is enough evidence to establish that the employer's motive for the complained of action was the *disability itself*, or in this case, the employee's association with someone who had a disability. *See Dewitt*, 517 F.3d at 953 (Posner, J., concurring) ("But if the disability plays no role in the employer's decision—if he would discriminate against any employee whose spouse or dependent ran up a big medical bill—then there is no *disability* discrimination." (emphasis in original)). Here, there is enough evidence to raise a factual dispute as to whether Aliferis's disability played a role

17

## IV. Conclusion

For the reasons stated above, the Defendants' motion for summary judgment, R. 46, is denied.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 19, 2016

---

in Barrish's decision to fire Gaughan. And the Court need not definitively decide whether this is because Barrish feared that Aliferis's illness would distract Gaughan from his work going forward, or because Barrish just had an aversion to people with disabilities, or because of anything else.